UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

PAMELA R. SARGENT,

        Plaintiff,

v.                                                                             Case No.  5:06-cv-246-Oc-GRJ

MICHAEL J. ASTRUE,[1] Commissioner of
Social Security,

        Defendant.
_____

## ORDER

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for a period of disability and disability insurance benefits.  (Doc. 1.)  The Commissioner has answered (Doc. 9) and both parties have filed briefs outlining their respective positions.  (Docs. 15 & 18.)  For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED.**

## I. PROCEDURAL HISTORY

Plaintiff filed an application for a period of disability and disability insurance benefits on June 10, 2002, claiming a disability onset date of September 1, 1998. (R. 110-112.)  Plaintiff's application was denied initially (R. 90-94), and upon reconsideration. (R. 96-99.)  Thereafter, Plaintiff timely pursued her administrative remedies available before the Commissioner, and requested a hearing before an

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for Commissioner Jo Anne B. Barnhart as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Administrative Law Judge ("ALJ"). The ALJ conducted Plaintiff's administrative hearing on February 16, 2005 (R. 55-82) and issued a decision unfavorable to Plaintiff on March 23, 2005. (R. 20-31.)  The Appeals Council denied Plaintiff's request for review on May 11, 2006. (R. 5-7.)  On July 10, 2006, Plaintiff filed the instant appeal to this Court. (Doc. 1.)

## II. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[2] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[3]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[4] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[5] However, the district court will reverse the Commissioner's decision on plenary review if the decision

---

[2] See 42 U.S.C. § 405(g).

[3] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[4] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[5] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[6]   The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[7]  The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[8]

The ALJ must follow five steps in evaluating a claim of disability.[9]  First, if a claimant is working at a substantial gainful activity, she is not disabled.[10] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[11] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[12] Fourth, if a claimant's impairments do not prevent her from doing past

---

[6] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[7] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[8] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[9] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[10] 20 C.F.R. § 404.1520(b).

[11] 20 C.F.R. § 404.1520(c).

[12] 20 C.F.R. § 404.1520(d).

relevant work, she is not disabled.[13] Fifth, if a claimant's impairments (considering her RFC, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[14]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[15] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[16] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[17]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[18] In a situation where both exertional and non-exertional impairments are

---

[13] 20 C.F.R. § 404.1520(e).

[14] 20 C.F.R. § 404.1520(f).

[15] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). See also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[16] Doughty, 245 F.3d at 1278 n.2.  In Doughty the court explained this burden shifting as follows:
In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[17] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[18] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[19]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[20] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[21] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[22]

### III. **SUMMARY OF THE EVIDENCE**

Plaintiff was born on April 25, 1950 and was fifty-four (54) years old at the time of the decision. (R. 60.) Plaintiff has an eighth grade education (R. 62) but receive a GED, and has past relevant work history as a school clerical aide and as a cashier in a parking lot. (R. 157.) Plaintiff contends that she became disabled on September 1, 1998 due to carpal tunnel syndrome, reflex sympathetic dystrophy, irritable bowel syndrome, spastic colon, upper degenerative spinal cord and displaced lower disc, malrotation of the intestine, high blood pressure, occasional dizziness, and loss of hearing. (R. 140.)

---

[19] Walker, 826 F.2d at 1003.

[20] Wolfe, 86 F.3d at 1077-78.

[21] See id.

[22] See Doughty 245 F.3d at 1278 n.2.

Based upon the evidence submitted and the testimony presented at the hearing, the ALJ determined that Plaintiff has the following impairments: cervical disc disease, residuals from carpal tunnel surgery with suspected reflex sympathetic dystrophy, and joint pain with suspected fibromyalgia. (R. 30.)

The medical records disclose that Plaintiff was treated by Richard Flynn, M.D. from the period of November 24, 1997 through March 22, 1999. (R. 341-346.) Plaintiff was treated for cystitis, mild TMJ syndrome, elevated blood pressure, viral conjunctivitis and chest pains. Plaintiff reported to Dr. Flynn that she had been to the emergency room twice in the six months prior to their September 1998 visit for restrosternal and left-sided chest pains. Plaintiff reported that the pains lasted for approximately fifteen minutes at a time and she believed they were related to anxiety. Dr. Flynn referred Plaintiff for a thallium perfusion study to determine the cause of her chest pains, the results of which were normal. (R. 345.)

Plaintiff was referred by John Swicord, M.D. to Mike O. Tyler, Jr., M.D. for complaints of carpal tunnel syndrome. (R. 225-234.) Dr. Tyler diagnosed Plaintiff with atypical reflex sympathetic disorder. Plaintiff reported pain radiating down the arm from the shoulder and range of motion of the neck exacerbated her symptoms. (R. 228.) Dr. Tyler recommended that Plaintiff consider re-exploration of her carpal tunnel; however, Dr. Tyler did advise Plaintiff that it was possible she could become worse. Dr. Tyler ordered x-rays of the cervical spine, chest, and a MRI scan of the C-spine and LS-spine.

Plaintiff's EMG and nerve conduction test returned positive for carpal tunnel syndrome on the left side. (R. 225.) In addition, Dr. Tyler opined that Plaintiff "may be

getting some early cervical spondylosis." Dr. Tyler recommended that if Plaintiff were to re-explore her carpal tunnel syndrome, it would be important for her to have a definite good decompression of the entire carpal tunnel. Dr. Tyler also noted that Plaintiff's MRI scan of the cervical spine showed some spondylosis at C5-6 and the nerve root exit zones are smaller at the C5-6 level than the levels above and below.

Plaintiff was examined by Dr. Swicord on September 4 and September 10, 2002 for complaints of abdominal pain. An Upper GI series showed no abnormalities. (R. 255.)

On March 11, 2003, Plaintiff was examined by Yasmin Heater, M.D. for a disability examination at the request of the Disability Determination Services. (R. 267-271.) Plaintiff complained of stiffness in the arms, neck and shoulders that caused difficulty sleeping. Dr. Heater noted that Plaintiff had difficulty rising from a chair when using her arms and that she had a loss of the radial pulse with 90 degree flexion at the elbows and lateral rotation, which Dr. Heater noted was a positive sign in some patients of Thoracic Outlet Syndrome.

After a review of the medical record, Dr. Heater concluded that Plaintiff suffered from left carpal tunnel, cervical spondylosis at C5-6 and possible Thoracic Outlet Syndrome. Plaintiff suffered from mild hearing loss, and an MRI of her whole brain revealed mild white matter changes most likely consistent with hypertension and sinusitis. Dr. Heater diagnosed Plaintiff with hypertension, bilateral upper extremity weakness that could be explained by cervical spondylosis, perceived bilateral upper extremity weakness, bilateral carpal tunnel syndrome and a hearing impairment. (R. 269.)

On March 12, 2003, Plaintiff was evaluated by Robert A. Hendrix, M.D., at the request of the Disability Determination Services. (R. 272-273.) Plaintiff was referred to Dr. Hendrix for right hearing loss with severe ringing. Dr. Hendrix found that Plaintiff had mild, flat sensorineural hearing loss, but no asymmetrical hearing loss and excellent speech discrimination.

Plaintiff was first seen by Gabriel M. Umana, M.D. on March 1, 2004. (R. 339-340.) Dr. Umana noted that Plaintiff's only complaint was chest pains. Dr. Umana noted that Plaintiff's EKS was fairly normal and diagnosed Plaintiff with hypertension, dyslipidemia, seasonal allergies and IBS. Dr. Umana referred Plaintiff to a cardiologist for stress tests. Plaintiff returned to Dr. Umana on March 29, 2004 for a follow-up visit. (R. 337-338.) Dr. Umana noted that Plaintiff's bone density revealed osteopenia and that Plaintiff had elevated cholesterol. Plaintiff's rheumatoid factor was negative. Dr. Umana recommended that Plaintiff exercise and watch her diet, take calcium and vitamin D, and referred Plaintiff to a pain clinic given her history of multiple joint pains for a diagnosis.

On April 26, 2006, Plaintiff was evaluated by Mangala Shetty, M.D. for complaints of left shoulder, elbow and wrist pain, as well as bilateral ankle and knee pain. Plaintiff reported some chest pain and constipation, but no dizziness. Dr. Shetty noted that Plaintiff had moderate tenderness in the mid line and paravertebral area around C5-6 and C6-7. Plaintiff had tenderness over the trapezius, especially on the left side. Abduction on the left shoulder was limited, as was her internal rotation on the left side. Plaintiff had moderate tenderness of the lumbar spine, especially over L4-5 and L5-S1. (R. 283.) Dr. Shetty noted that Plaintiff's motor tone and bulk were normal for

both upper and lower extremities, hand grip was 5/5 bilaterally, Plaintiff had normal biceps strength, but had weakness of the triceps on the left side.

Dr. Shetty concluded that Plaintiff suffered from cervicalgia with cervical radiculopathy, most likely involving the C5, C6 and C7 nerve roots. Dr. Shetty ruled out lumbar radiculopathy, but found that Plaintiff had possible neural foramen stenosis at L4-5, based on examination. An MRI of the cervical spine revealed that Plaintiff had small disk protrusions without evidence of cord compression or nerve root impingement at the C4-5 level, degeneration of the C5-6 disk without evidence of disk protrusion or extrusion, and mild osteophytic narrowing of the neural foramina bilaterally. (R. 286.) An MRI of the lumbar spine showed mild degenerative spondylosis of the lumbar spine with no evidence of disk herniation, spinal stenosis or osseous lesion. (R. 287.)

On April 1, 2004, Plaintiff was seen by J. Robert McGhee, D.O., F.A.C.C., for complaints of left sided chest tightness. (R. 292-293.) Plaintiff reported to Dr. McGhee that she did not exercise but was active in terms of house work and yard work. Plaintiff reported no significant problems with discomfort with anxiety. Dr. McGhee found that Plaintiff had atypical chest pain, mild mitral and tricuspid insufficiency, hypertension, hyperlipidemia, elevated liver function studies and possible carotid occlusive disease.

Plaintiff returned to Dr. Umana on April 26, 2004. (R. 324.) Dr. Umana noted that Plaintiff's slightly elevated liver enzymes returned to normal and that Plaintiff was "clinically stable." Plaintiff continued to complain of joint pain. Plaintiff reported that she had no hearing loss, shortness of breath, or GI or GU complaints.

On May 3, 2004, Plaintiff returned to Dr. McGhee for a follow up of her symptoms. Plaintiff's Thallium Stress Test, administered on April 23, 2004, showed

normal segmental wall motion and function. Plaintiff's Echocardiogram showed mild fibrocalcific mitral valve disease with mild anterior leaflet prolapse, mild mitral insufficiency, and mild tricuspid and pulmonic insufficiency. Plaintiff's carotid ultrasound showed a minor 25% stenosis at the right carotid bulb with mild intimal thickening, and was otherwise unremarkable. (R. 291.) Dr. McGhee diagnosed Plaintiff with atypical chest pain, mild mitral valve prolapse, mild mitral insufficiency, essential hypertension, hyperlipidemia, and mild carotid occlusive disease.

On October 27, 2004, Plaintiff presented to Dr. Umana with complaints of swelling of her ankles, hands and wrists. Dr. Umana noted that her blood pressure was under control; however, Plaintiff was "not really being compliant with her visits." Plaintiff denied headaches, dizziness, chest pains, shortness of breath and abdominal complaints. Dr. Umana concluded the swelling was a side effect from Norvac and discontinued Plaintiff's use of the drug. Dr. Umana advised Plaintiff to be compliant with her visits. (R. 322.)

On November 17, 2004, Plaintiff reported to Dr. Umana that she continued to suffer from joint pain and believed that she might have fibromyalgia after she read an article about fibromyalgia and noticed how many of the trigger points resembled her own symptoms. (R. 320.) Plaintiff complained of anxiety, but no depression. Plaintiff again reported no GI or GU complaints, hearing loss, chest pains, shortness of breath, or headaches. Plaintiff was referred for a liver ultrasound and for a further GI workup due to "slightly elevated LFT."

Plaintiff returned to Dr. Umana on December 15, 2004 for a follow-up visit for body aches. (R. 317-318.) Plaintiff complained of pain in the left lower quadrant that

came and went. Plaintiff denied diarrhea and depression. Dr. Umana diagnosed Plaintiff with body aches, most likely fibromyalgia, anxiety, insomnia and abdominal pain, rule out hernia. Dr. Umana referred Plaintiff to a rheumatologist to discuss fibromyalgia and referred Plaintiff to a surgeon to rule out whether she had a hernia.

Plaintiff received physical therapy for slightly over two months during the time period of November 29, 2004 through January 10, 2004. (R. 298-345.) Plaintiff's discharge summary states that Plaintiff's lumbar spine was within normal limits. The physical therapist noted that Plaintiff continued to complain of "vague pain" in "multiple areas," that physical therapy "provided minimal relief at this time," and that Plaintiff was "being worked up for fibromyalgia."

On January 12, 2005, Plaintiff returned to Dr. Umana for a follow-up visit for her joint pain. Dr. Umana noted that despite taking Effexor, Plaintiff was still not having remission. Plaintiff reported that she was sleeping better with two Restoril doses at night and that her anxiety was better controlled. Plaintiff denied any depression. Plaintiff reported to Dr. Umana that she was going to apply for disability, but could not get a rheumatologist appointment prior to that date. Dr. Umana diagnosed Plaintiff with anxiety, improved and joint and muscle aches. Plaintiff was recommended to followup with Dr. Shetty at the pain clinic and with Dr. Chandra for a possible hernia and a further GI workup for IBS. (R. 316.)

## IV. DISCUSSION

Plaintiff raises two issues on appeal. First, Plaintiff argues that the ALJ failed to find all of her alleged impairments severe. Secondly, Plaintiff contends that the ALJ improperly evaluated her subjective complaints of pain.

The Court will turn first to Plaintiff's argument that the ALJ failed to make a complete finding regarding all of her alleged severe impairments. At step two in the sequential analysis, the ALJ found that Plaintiff had severe impairments of cervical disc disease, residuals from carpal tunnel surgery with suspected reflex sympathetic dystrophy and joint pain with suspected fibromyalgia. (R. 30.) According to Plaintiff, the ALJ failed to find that Plaintiff's complaints of tinnitus and irritable bowel syndrome were severe impairments at step two of the sequential evaluation process.

A severe impairment is one that significantly limits your physical or mental ability to do basic work activities.[23] An impairment can be considered not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.[24]

Contrary to Plaintiff's assertion, the ALJ did consider Plaintiff's claims of tinnitus and stated that Plaintiff "apparently is having no problems at this time, since it has not been mentioned in recent medical records, nor was it mentioned at the hearing."[25] Plaintiff repeatedly denied hearing problems over the course of a year of treatment from 2004-2005 with Dr. Umana. The last medical record showing that Plaintiff even

---

[23] 20 C.F.R. § 404.1520(c) (2007).

[24] Bridges v. Bowen, 815 F.2d 622, 625 (11th Cir. 1987).

[25] R. 29.

complained of a hearing problem was in 2003 and the results of the hearing tests did not show the asymmetrical hearing loss claimed. Plaintiff had only a "mild" flat sensorial hearing loss and had "excellent" speech discrimination.

The ALJ also addressed Plaintiff's claims of anxiety and stated that while there is mention that Plaintiff has some anxiety, "she has never sought mental health treatment, nor has it been suggested." In addition, Plaintiff reported to Dr. Umana in January, 2005 that she was she was sleeping better with two Restoril at night and that her anxiety was better controlled.[26]

Plaintiff also failed to show that her irritable bowel syndrome was a severe impairment. Plaintiff repeatedly denied GI complaints throughout her visits with Dr. Umana. Despite Plaintiff's argument that she suffers from "chronic diarrhea," Plaintiff denied abdominal pains and diarrhea throughout 2004 and into 2005.[27] While Plaintiff was diagnosed with IBS, that alone does not mean that it has any effect upon her ability to work.  The mere fact that an individual is diagnosed with a condition does not mean that the condition would cause limitations that would warrant a finding of a severe impairment. The disability must have an effect upon the ability to work, "and not simply in terms of deviation from purely medical standards of bodily perfection or normality."[28] Here, the medical evidence of record does not support Plaintiff's claims that she suffers from the severe impairments of tinnitus or IBS.

---

[26] R. 316.

[27] R. 322, 317, 320.

[28] McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir.1986).

Plaintiff's second argument is that the ALJ improperly applied the law in the Eleventh Circuit in finding Plaintiff's complaints of pain not credible The law concerning the analysis of subjective complaints of pain is well settled. In evaluating disability, the ALJ must consider all of a claimant's impairments, including her subjective symptoms, such as pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.[29] The Eleventh Circuit has set forth a three-part test for determining when a disability may be established based on subjective complaints of pain.[30] The "pain standard" requires that the plaintiff first produce medical or other evidence of an underlying medical condition.  Then the plaintiff must demonstrate either that objective medical evidence confirms the severity of the alleged pain arising from that condition or that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.[31]  "Pain alone can be disabling, even when its existence is unsupported by objective evidence."[32]  However, a claimant's subjective complaints of pain do not conclusively establish a disability unless accompanied by medical evidence.[33]

---

[29] 20 C.F.R. § 404.1528.

[30] Landry v. Heckler, 782 F.2d 1551, 1553 (11th Cir. 1986).

[31] Id.

[32] Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987).

[33] 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms *shall not alone be conclusive evidence of disability* as defined in this section; there *must* be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would

(continued...)

If an ALJ decides not to credit a claimant's testimony about subjective complaints, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.[34] A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.[35]

In the instant case, the ALJ applied the Eleventh Circuit's pain standard "threshold"[36] assessment to Plaintiff's subjective complaints by noting that Plaintiff presented objective medical evidence that established that cervical disc disease, residuals from carpal tunnel surgery with suspected reflex sympathetic dystrophy, and joint pain with suspected fibromyalgia were medical impairments.[37] Once Plaintiff met this initial burden, however, the ALJ found Plaintiff's complaints regarding her level of pain and inability to work were not wholly credible.[38]

In making this finding, the ALJ conducted a thorough examination of Plaintiff's medical history, including Plaintiff's complaints of pain. The ALJ noted and properly recognized that Plaintiff complained of "stiffness in her arms, neck and shoulders, which made sleeping difficult and made it difficult for her to use her upper extremities," that

---

(...continued)
lead to a conclusion that the individual is under a disability") (emphasis added).

[34] Foote, 67 F.3d at 1561-62; Jones v. Department of Health and Human Servs., 941 F.2d 1529, 1532 (11th Cir. 1991) (finding that articulated reasons must be based on substantial evidence).

[35] Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

[36] Marbury, 957 F.2d at 839.

[37] R. 25.

[38] R. 28.

she left her job as a teacher's assistant "due to abdominal pain," and that she reported to her physical therapist that she experienced "vague pain" in "multiple areas."[39]

In accordance with the pain standard, the ALJ in this case articulated his reasons for discounting Plaintiff's complaints of pain. The ALJ specifically found that although Plaintiff alleges major problems with her left hand and arm, she was last evaluated several years ago and did not follow up with Dr. Tyler's recommendation of surgery. Furthermore, the ALJ noted that while Plaintiff complained of neck and back pain, the objective testing did not show any condition that would cause the pain Plaintiff alleged. Plaintiff suggested to her physician that she might have fibromyalgia, but Plaintiff did not include any medical records from a rheumatologist which would confirm this diagnosis.

The ALJ also found that Plaintiff's claims that she had a limited ability to stand, walk, or sit were not credible. Plaintiff never complained of an inability to stand, walk or sit in over a year of treatment with Dr. Umana. In fact, Plaintiff was instructed by Dr. Umana to be more compliant with her visits and instructed Plaintiff to exercise.[40]

Lastly, the ALJ in his analysis properly noted that Plaintiff's activities of daily living, including cooking and laundry, watching the news and attending church, were inconsistent with her claims that she had a limited ability to stand, walk, or sit. Furthermore, while Plaintiff testified that her husband does most of the housework and that she preforms no yard work, Plaintiff reported to Dr. McGhee that she was active in

---

[39] R. 26-28.

[40] R. 338.

terms of house work and yard work.[41] While the Plaintiff's activities of daily living are not conclusive evidence that she was not disabled during the relevant period of time, these activities are, nonetheless, consistent with the ability to perform light level work.

Accordingly, the Court concludes that the ALJ followed the Eleventh Circuit pain standard in analyzing whether the Plaintiff's subjective complaints were credible. The ALJ articulated specific reasons for rejecting Plaintiff's testimony that she had a limited ability to stand, sit or walk, which reasons were based upon the medical evidence and other substantial evidence of record. Where, as here, an ALJ has made a clearly articulated credibility finding based upon substantial supporting evidence in the record, a reviewing court should not disturb the findings by the ALJ.

## V. CONCLUSION

In view of the foregoing, it is hereby **ORDERED** that the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter judgment accordingly and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on September 24, 2007.

GARY R. JONES
United States Magistrate Judge

Copies to:
All Counsel

---

[41] R. 292-293.